C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
ADIL KHALIL,                            :
                                             :

                       Plaintiff,     :     **MEMORANDUM DECISION AND**
                                             :     **ORDER**

       - against -             :
                                             :     24-cv-4823 (BMC)

CITY OF NEW YORK, *et al.*,       :
                                           :

                   Defendants.    :
-------------------------------------------------------- X

**COGAN**, District Judge.

      Plaintiff *pro se* brings fourteen causes of action against the City of New York (the "City"), John and Jane Doe NYPD officers #1-10 (the "police officers"), City EMTs Michael White and Quinn Mattia (the "EMTs"), NYC Health & Hospital ("NYCHH"), and NYCHH nurses Marlayna Leader and Brando Li (the "nurses") in connection with events that transpired on the night of February 10, 2023. Plaintiff claims that when he sought police officers' aid after a bar brawl, officers pushed him to the ground, handcuffed him and, with the help of the EMTs, transported him to a hospital against his will. Once plaintiff arrived at the hospital, nurses injected him with antipsychotic drugs and deprived him of his glaucoma medication. Plaintiff has a schizotypal personality disorder, and asserts that he was arrested pursuant to the City's "Emotionally Disturbed Person" policy, Section 221-13 of the NYPD Patrol Guide ("EDP Policy"), which allows the police to detain individuals whom they reasonably believe are mentally ill.

      All defendants moved to dismiss the complaint. Consistent with defendants' Local Rule 12.1 notices previously served on plaintiff, the Court advised plaintiff that it would convert defendants' motions to dismiss into motions for summary judgment and directed plaintiff to

submit any additional evidence that he wanted the Court to consider.  Plaintiff did not submit any

additional evidence, and his time for doing so has passed.

For the reasons set forth below, defendants' motions for summary judgment are granted

and this case is dismissed.

## BACKGROUND

### I.    Summary of Complaint

The complaint spends almost 20 pages (paragraphs 30 through 94) detailing the City's

historic policies and procedures regarding individuals in mental health crisis.  Plaintiff clearly

copied these allegations directly from paragraphs 65 through 130 of the second amended

complaint in another case, Greene v. City of New York, No. 21-cv-5762 (S.D.N.Y. Apr. 20,

2023) (Dkt. 155), changing only a few words and phrases.  Because plaintiff did not draft these

allegations from scratch, this Court largely adopts Judge Preska's summary of these allegations

from her decision on the defendants' motion to dismiss the second amended complaint in

Greene.  See Greene v. City of New York, 725 F. Supp. 3d 400, 410-12 (S.D.N.Y. 2024).

Each year, the NYPD responds to approximately 200,000 calls regarding Emotionally

Disturbed Persons ("EDPs").  Pursuant to New York Mental Hygiene Law § 9.41, the police

"may take into custody any person who appears to be mentally ill and is conducting himself or

herself in a manner which is likely to result in serious harm to the person or others."  Once in

protective custody, § 9.41 directs the police to transport the person to "any [approved] hospital ...

or any comprehensive psychiatric emergency program" so that he or she may receive mental

health treatment.

The EDP Policy, NYPD Patrol Guide § 221-13, implements § 9.41.  The purpose of the

EDP Policy is to "safeguard a mentally ill or emotionally disturbed person who does not

voluntarily seek medical assistance."  The EDP Policy provides detailed instructions on how to effectuate an arrest when an officer "reasonably believes that a person who is apparently mentally ill or emotionally disturbed, <u>must</u> be taken into protective custody because the person is conducting himself in a manner likely to result in a serious injury to himself or others."

Plaintiff objects to the EDP Policy on two grounds.  First, he claims that the Policy "requires members of the NYPD to take an individual into custody even where 'the EDP is unarmed, not violent, and willing to leave voluntarily,'" and therefore vests officers with "unbridled discretion" in determining whether someone is mentally ill and whether detention is warranted.  Plaintiff is clearly wrong on the first front, as the Policy does not require that the police take individuals into custody, but rather sets forth procedures for taking individuals into custody when police deem custody necessary.  To a less exaggerated extent, plaintiff appears to be right on the second front: officers, not mental health professionals, are tasked with determining whether someone is mentally ill and whether someone must be taken into custody to prevent harm to himself or others.

Second, plaintiff claims that in effectuating mental health arrests, the police mistreat EDPs, causing "traumatization, serious injuries, deaths, arrests, imprisonments, and forced hospitalizations."  In support, plaintiff details 24 incidents since 1984 in which mentally disabled individuals were killed by police responding to EDP calls.  Plaintiff further relies on two reports documenting the NYPD's inadequate treatment of those with mental disabilities.  For example, in 2002, an Urban Justice Center report concluded that the "NYPD's training programs and protocols for dealing with individuals in emotional or psychiatric crisis are not only bad policy, they may also violate federal and state law."  In 2017, the New York City Department of Investigation, Office of the Inspector General for the NYPD, promulgated a report which

"identified long-standing deficiencies in the NYPD's handling of responses to individuals with mental disabilities or perceived mental disabilities."

Finally, plaintiff documents what he deems a long history of failed efforts to reform the NYPD's handling of mental health calls. For example, in 2014, the City committed to offering crisis intervention training to all NYPD officers, yet four years later, less than one-third of the force had been trained. In 2021, the City launched a pilot program, the Behavioral Health Emergency Assistance Response Division ("B-HEARD"), which aimed to have mental health professionals respond to "low acuity mental health 911 calls." The City first projected B-HEARD to continue to have police respond to just 30% of all calls, but plaintiff avers that the NYPD, NYFD, and EMTs "continue to respond to nearly all mental health 911 calls." Due to this and a number of other deficiencies, plaintiff characterizes B-HEARD as "only the latest in a series of failed efforts" to craft an appropriate response to those in mental health crisis. He concludes that the City's consistent failure to divest the NYPD of its authority to respond to mental health calls "has led to the criminalization of individuals deemed by the NYPD to be 'EDPs,' the traumatization of these individuals, extensive injuries to these individuals, and far, far too many deaths."

Plaintiff then recounts his personal experience. On February 10, 2023, around 9:50 PM, plaintiff was beaten and robbed at gunpoint at Pregame Sports Bar & Lounge in Jamaica, Queens. In an affidavit, plaintiff recalls that he was punched in the face until he was brought down to all fours, repeatedly punched in the back of the head, and dragged on his knees and thrown out of the bar. Plaintiff then made his way to the 103rd Precinct of the NYPD to file a police report. In his affidavit, plaintiff states, "I had actually called, and it will sound foolish, I'm sorry I'm so immature your Honor, but I called the FBI hotline in NYC to report that I

4

intended to go to the precinct and a violation of 18 U.S.C. 242 was about to occur when I arrive [*sic*] at the precinct to file my report."

Plaintiff entered the 103rd Precinct at 10:30 pm, where he claims that officers locked him in the entry vestibule. Plaintiff maintains that he "was calm, and NYPD officers were able to determine that he was alone, not injured, and had no weapons." In another affidavit, however, plaintiff admits to using "a litany of curses" and "racial slurs" toward the arresting officers. Plaintiff spoke with the officers through the window for ten minutes, after which time they pushed him against a wall and then onto the ground and placed him in handcuffs. The EMTs arrived at some point and, with the assistance of the police officers, strapped plaintiff to a gurney and placed him in an ambulance. The EMTs and one police officer transported plaintiff to Queens General Hospital, a branch of NYCHH.

At the hospital, the EMTs and officer brought plaintiff directly to triage. Once there, plaintiff told the nurses that he was legally blind and suffered from ocular inflammation, glaucoma, sarcoidosis, and a schizotypal personality disorder. Plaintiff then repeatedly told the nurses that he needed his glaucoma medication[1] and that he did not want any treatment or testing. He also told the nurses that he was at risk of a metabolic acidosis episode and at risk of serious kidney disease or failure and ketoacidosis.

Despite the nurses' assurances that they would not subject plaintiff to testing, they – with the assistance of the police officer – held plaintiff down while he was still handcuffed and strapped to the gurney, took his blood, and injected him with antipsychotic drugs until he went unconscious. Plaintiff never spoke to a doctor or psychiatrist or received a psychiatric

---

[1] Plaintiff submitted two doctor's notes which, assuming both are current, prescribe the following daily medications for plaintiff's eye condition: Alphagan and Dorzolamide/Timolol at 6:00 AM and 1:00 PM; Acetazolamide at 9:00 AM and 9:00 PM; Brimonidine at 6 AM and 1:00 PM; Rocklatan at 10:30 PM; and Lantanoprost at 10:30 PM.

evaluation.  The police officer woke plaintiff the next morning and escorted him out of the hospital.

As a result of defendants' conduct, plaintiff claims that he suffered "glaucoma trauma to the right eye, emergency kidney surgery for large renal calculi ketoacidosis episode caused by metabolic acidosis as a reaction to massive dosage of drugs ... , bruising on his back, swelling in his hands, and abrasions on his legs, as well as emotional distress due to the detention and psychological medical effects of the drugs (sarcoidosis flare-ups, seizures and emotional outbursts) causing a major mental health episode."

Plaintiff submitted various documents with his oppositions to the defendants' motions. With his opposition to the City and NYCHH's motions, plaintiff submitted: a credit card bill from the bar; discharge paperwork from the hospital; two doctor's letters regarding treatment for his eye condition; an affidavit regarding the incidents in question; an affidavit concerning unrelated matters involving the Suffolk County Police Department; and a photo of a scab on his lower left leg which he alleges was caused by his arrest.  With his opposition to the nurses and EMTs' motions, plaintiff submitted an additional affidavit regarding the incidents and a host of documents concerning an unrelated family offense proceeding and other unrelated matters.

Approximately six months after all the motions to dismiss had been fully briefed, the Court gave plaintiff two weeks to submit any additional evidence that he wanted the Court to consider, explaining that it would be converting defendants' motions into motions for summary judgment.  Plaintiff did not submit anything.  Accordingly, the complaint, plaintiff's oppositions to defendants' motions, and the exhibits attached to each constitute the universe of plaintiff's evidence.

II.    **Relevant Procedural History**

When he filed his complaint, plaintiff was unaware of the identities of the police officers, EMTs, and nurses who allegedly harmed him.  Therefore, after the Court granted plaintiff's *in forma pauperis* motion, Magistrate Judge Bloom ordered the Corporation Counsel of the City of New York to ascertain the full names and service addresses of the police officers, EMTs, and nurses involved pursuant to Valentin v. Dinkins, 121 F.3d 72 (2d Cir. 1997).  Eventually, NYCHH identified the nurses and the City identified the EMTs.

On December 5, 2024, the City requested relief from the Court's Valentin Order with respect to the police officers, explaining that following a diligent two-and-a-half month search in which it "pursued and exhausted every available lead and source of information," it had been unable to identify the purported officers described in the complaint.  Among other things, the City "reviewed the 103rd Precinct's February 10, 2023 and February 11, 2023 roll calls and command logs; bodycam footage from officers who were present at the 103rd Precinct on February 10, 2023 and February 11, 2023 and given hospital assignments; and the activity logs from virtually every officer who was likely to be present at the 103rd Precinct during the time in question," and "interviewed ten NYPD members from the 103rd Precinct, ... all of whom stated they have *no recollection or record of any event occurring like the one described by [p]laintiff.*" (Emphasis added).  A sergeant, two captains, and a lieutenant who the City interviewed noted that the absence of records in the command logs "strongly suggests that the events described in [p]laintiff's [c]omplaint are inaccurate."

The City went on to explain that the following facts "heightened" the probability of inaccuracy:

(1) According to the prehospital care report summary, the FDNY EMTs who arrived at the 103rd Precinct found Plaintiff "sitting on a bench inside the [103rd Precinct]," where Plaintiff "stated, 'I wanna go to the hospital [sic].'"

(2) According to EMT Mattia, one of the responding FDNY EMTs, he "almost always notes the presence of an NYPD officer" in the Report Summary if one accompanies a patient in the ambulance.

(3) According to Lt. Jenkins, the only time the 103rd Precinct has an officer ride in an ambulance with EMTs is when an individual is combative; and where that is the case, there would "absolutely be a note of it" in that day's command log or some other report.

(4) None of the officers interviewed had any body camera footage or entries in their activity logs concerning the events Plaintiff alleges in his Complaint.

(5) According to Lt. Jenkins, the precinct doors "are never locked," which Plaintiff suddenly alleges was the case in his Opposition to Defendants' Motion to Dismiss.

Additionally, although NYCHH had "no record" of an officer bringing plaintiff to the hospital, NYCHH staff members recalled that plaintiff was escorted out of the hospital by NYCHH Police and not by an NYPD officer.

Magistrate Judge Bloom granted the City's motion and relieved the City of further Valentin obligations, noting that courts may decline to issue Valentin orders "where a defendant is unable to identify the relevant parties based on the information a plaintiff has provided." Lurch v. Doe Officers, No. 22-cv-2324, 2022 WL 17617837, at *1-2. Judge Bloom also found that the City had reasonably complied with the Valentin Order.

## DISCUSSION

### I. Legal Standard

Under Rule 12(d) of the Federal Rules of Civil Procedure, "[i]f, on a motion under Rule 12(b)(6) ... , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be

given a reasonable opportunity to present all the material that is pertinent to the motion." A *pro se* litigant "must have unequivocal notice of the meaning and consequences of conversion to summary judgment" because he "may be unaware of the consequences of his failure to offer evidence bearing on triable issues." Henderson v. Alvarez, No. 17-cv-3977, 2020 WL 2571013, at *5 (S.D.N.Y. May 21, 2020) (quoting Hernandez v. Coffey, 582 F.3d 303, 307-08 (2d Cir. 2009)).

The "unequivocal notice" requirement is clearly met. On three occasions, defendants provided plaintiff with a "Local Rule 12.1 Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings." These notices explained that defendants had submitted additional written material in support of their motion to dismiss; that this Court could elect to treat the motions to dismiss as motions for summary judgment; that plaintiff had to submit documentary evidence or witness statements to counter the material submitted by the defendants and could not merely rely on the allegations in his complaint; and that failure to submit such evidence could result in the Court accepting the facts asserted by the defendants as true and dismissing the case without a trial. Further, plaintiff himself submitted material outside the complaint with his oppositions to the defendants' motions to dismiss and acknowledged that that he was doing so "in support of his motion for summary judgment" – another factor indicating that there is "no unfair surprise" to plaintiff from the conversion of the motions. See Black v. Blackmun, No. 11-cv-2372, 2011 WL 6019394, at *1 (E.D.N.Y. Dec. 1, 2011). Finally, to obviate any doubts as to the sufficiency of notice, the Court explicitly told plaintiff in an Order that it would be converting all defendants' motions to dismiss into motions for summary judgment and directed him to file any additional evidence that he wanted the Court to consider within two weeks of that Order.

Because conversion is appropriate, the Court analyzes defendants' motions under the summary-judgment standard. Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

A party may not defeat a motion for summary judgment solely through "unsupported assertions" or conjecture. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). Rather, "'[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita, 475 U.S. at 586-87); see also Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994). Indeed, the non-moving party must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256.

"Pro se litigants are afforded 'special solicitude' on motions for summary judgment." Henderson, 2020 WL 2571013, at *6 (quoting Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988)); see also Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) ("It is

10

well established that the submissions of a pro se litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest."). However, "pro se status does not exempt a party from compliance with relevant rules of procedural and substantive law." Triestman, 470 F.3d at 477 (2d Cir. 2006) (internal quotation marks and citation omitted); see also Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003) (stating that the obligation to read *pro se* pleadings liberally "does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment"). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)).

## II.    Claims Against the Police Officers

The City has never been able to identify the police officers who were allegedly involved in the incidents detailed in plaintiff's complaint, despite its most diligent efforts. It has been a year since Magistrate Judge Bloom relieved the City of its Valentin obligations and a year and a half since this case was filed, and yet plaintiff likewise has not been able to identify the police officers. "Where a plaintiff 'has had ample time to identify' a John Doe defendant but gives 'no indication that he has made any effort to discover the [defendant's] name,' ... the plaintiff 'simply cannot continue to maintain a suit against' the John Doe defendant." Coward v. Town & Vill. of Harrison, 665 F. Supp. 2d 281, 300 (S.D.N.Y. 2009) (quoting Kearse v. Lincoln Hosp., No. 07-cv-4730, 2009 WL 1706554, at *3 (S.D.N.Y. June 17, 2009)). The police officers are therefore dismissed.[2] See Charles v. Cnty. of Nassau, 116 F. Supp. 3d 107, 110 (E.D.N.Y. 2015)

---

[2] Additional factors support an alternative finding that the events involving the police officers did not actually occur. First, as the City's motion seeking relief from its Valentin obligations makes clear, there is no evidence whatsoever of plaintiff's allegations against the police officers, and the evidence that the City does have directly undermines plaintiff's core allegations. See Background, Section II, supra. Second, the complaint raises red flags of

(dismissing claims against unidentified defendants *sua sponte*); Tortora v. City of New York, No. 15-cv-3717, 2019 WL 9100369, at *25 (E.D.N.Y. Mar. 30, 2019) (same).

Additionally, the Court grants summary judgment to defendants on all causes of action which are predicated entirely on the officers' conduct: Count III (excessive force in violation of the Fourth and Fourteenth Amendments); Counts VI and VII (excessive force and failure to intervene in violation of the Eighth Amendment); and Count XIII (various violations of the New York Constitution and New York common law). See Coward, 665 F. Supp. 2d at 299. The Court will evaluate the remaining causes of action only as they relate to the remaining defendants.

## III.    Disability Discrimination: Counts I, II and XIV

Plaintiff brings disability discrimination claims under Title II of the Americans with Disabilities Act ("ADA"), § 504 of the Rehabilitation Act, and the New York City Human Rights Law ("NYCHRL"). The Court will consider the ADA and Rehabilitation Act claims together, see Davis v. Shah, 821 F.3d 231, 259 (2d Cir. 2016), then separately evaluate the NYCHRL claim, see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).

### A.    ADA and Rehabilitation Act (Counts I and II)

"Both Title II of the ADA and § 504 of the Rehabilitation Act protect the rights of disabled individuals to participate in state-administered or funded services." Davis, 821 F.3d at

---

implausibility. In addition to plagiarizing pleadings and briefs from other cases, plaintiff has made strikingly (and suspiciously) similar claims to ones he's made in prior lawsuits. For example, in Khalil v. City of New York, No. 17-cv-1729, 2019 WL 1597315, at *1 (E.D.N.Y. Apr. 15, 2019), plaintiff similarly alleged that the NYPD took him into custody pursuant to the EDP Policy and "denied [him] medication for his ocular inflammation and [] injected [him] with antipsychotic medications without his consent." Third and finally, the Court has good reason to doubt plaintiff's credibility: plaintiff is a serial litigant who is subject to an anti-suit injunction dated September 18, 2019 as a result of the number of frivolous actions he has brought in this Court.

259.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, § 504 provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

"To state a prima facie claim under either the ADA or the Rehabilitation Act, ... [plaintiff] must allege: '(1) that he is a qualified individual with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability.'"  Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (quoting Hargrave v. Vermont, 340 F.3d 27, 34-35 (2d Cir. 2003)).  A qualified individual is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).  "A qualified individual can base a discrimination claim on any of three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; [or] (3) failure to make a reasonable accommodation."  Id. (internal quotation marks and citation omitted).

Plaintiff, who has schizotypal personality disorder (a purported mental disability), argues that the EDP Policy discriminates against individuals with mental disabilities or perceived mental disabilities because it "provides for police interactions with individuals who have a

13

mental disability or who [officers] deem to be 'apparently mentally ill or emotionally disturbed,'" and directs officers to take such an individual into protective custody "even if the individual is 'not violent and willing to leave voluntarily.'"  Plaintiff further argues that in his case, defendants "failed to accommodate [him] by failing to provide non-police services to him knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalat[ed] the interactions; (b) seiz[ed] [him] without probable cause or basis; (c) us[ed] excessive and extreme force; (d) wrongly determin[ed] that [he] required hospitalization; and (e) inappropriately deploy[ed] the heavily-armed Emergency Services Units that lead to further escalation."

Now that the Court has dismissed the police officers and the allegations against them, plaintiff cannot show that he was personally harmed by the EDP Policy, and therefore does not have standing to challenge the EDP Policy.  "To establish standing under Article III of the Constitution, a plaintiff must allege (1) *injury-in-fact*, which is a concrete and particularized harm to a legally protected interest; (2) *causation* in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be remedied by the requested relief."  Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 110 (2d Cir. 2018) (internal quotation marks and citation omitted).  In the absence of a mental health arrest, plaintiff cannot adduce – and, of course, has not adduced – any allegations or evidence that he was harmed by the EDP Policy.  And even if the EDP Policy is removed from the calculus, plaintiff's disability discrimination claims, as styled in the complaint, cannot lie because they are predicated entirely on the conduct of the dismissed police officers.  See Coward, 665 F. Supp. 2d at 299.

14

Plaintiff pursues a completely different legal theory in his opposition to the City and NYCHH's motions, arguing that his claim is instead or also "one that challenges the denial of services provided to non-disabled individuals rather than the adequacy of services."  Plaintiff states that defendants "failed to treat the emergency situation of the glaucoma and interocular pressure, [and] instead injected [him] unconscious with drugs[.]"  Under a liberal construction, plaintiff's argument appears to be that defendants discriminated against him on the basis of his mental disability by denying him treatment for his eye disease and administering medications that could exacerbate the symptoms of both his mental and physical disabilities.  Plaintiff has standing for this challenge because it is not predicated on the EDP Policy, and the challenge is facially valid because it is not based entirely on the conduct of the dismissed police officers.

The Second Circuit has recognized the importance of distinguishing between "positive" discrimination, which involves "drawing distinctions that are relevant to the qualities or characteristics of the thing observed," and "negative or pejorative" discrimination, which involves "withholding advantages or inflicting disadvantages on the basis of irrelevant criteria, under the influence of irrational bias," in the context of medical treatment.  Costin v. Glen Falls Hosp., 103 F.4th 946, 954 (2d Cir. 2024) (quoting McGugan v. Aldana-Bernier, 752 F.3d 224, 231 (2d Cir. 2014)).  As the Second Circuit explained:

> Since disability is so often associated with a medical condition, the distinction ... is critical to prevent the federal statutes from displacing the state law causes of action for malpractice.  The federal law of discrimination does not review the conduct of "[a] doctor who administers a medical treatment to a patient (or withholds it) because the doctor's medical training leads her to conclude that the treatment is medically appropriate (or inappropriate)[.]"  [McGugan, 752 F.3d at 231].  If the treatment is merely deficient, imprudent, or harmful, the matter is one of medical malpractice.

Id.  Thus, "a plaintiff pleads an actionable claim of discrimination in the medical treatment context under the ADA or the Rehabilitation Act [only] if []he alleges that the defendants made

treatment decisions based on factors that are 'unrelated to, and thus improper to consideration of' the inquiry in question."[3] Id. (quoting McGugan, 752 F.3d at 234).

Here, whether to administer glaucoma medication or antipsychotic drugs clearly constituted medical decisions.  Plaintiff was suffering from alcohol intoxication (as shown in the hospital discharge paperwork that plaintiff submitted), and that is where nurses prioritized treatment.  "Even if this decision-making was faulty or constituted malpractice, it cannot support a claim under the [Rehabilitation Act] or ADA."  Id.  Although it is certainly possible that the nurses deprioritized plaintiff's eye concerns because he was exhibiting signs of mental illness, the Court cannot say that plaintiff's mental illness would have been an unrelated and improper factor for nurses to consider when deciding how to treat plaintiff that night.  Moreover, plaintiff hasn't adduced any evidence that this is actually what happened.  Counts I and II therefore fail.

**B.    NYCHRL (Count XIV)**

"Under [the] NYCHRL, it is unlawful for any owner of a place or provider of public accommodation to deny an individual full and equal enjoyment, on equal terms and conditions, of accommodations or services based on an individual's disability."  Lowell v. Lyft, Inc., 352 F. Supp. 3d 248, 262-63 (S.D.N.Y. 2018) (citing N.Y. City Admin. Code § 8-107(4)).  It does not matter that the NYCHRL is substantively broader than its federal counterparts: plaintiff does not have standing to challenge the EDP Policy under any statute.  Moreover, plaintiff has provided no allegations or evidence which would permit a jury to infer that the medical treatment he received (irrespective of the EDP Policy) was a result of disability discrimination rather than non-nefarious medical decision-making.  Therefore, Count XIV fails.

---

[3] The Court's insertion of "only" aligns this principle with the Second Circuit's intent, notwithstanding its phrasing. See Costin, 103 F.4th at 954 ("We agree with the district court that [plaintiff]'s claims are barred by McGugan[.] ... Even if [the defendants'] decision-making was faulty or constituted malpractice, it cannot support a claim under the [Rehabilitation Act] or ADA.").

IV.     <u>**Constitutional Violations: Counts IV, V, VIII, and IX**</u>

Plaintiff lodges a myriad of constitutional claims.  Although not always mentioned,

42 U.S.C. § 1983 operationalizes these claims.  Section 1983 "is not itself a source of substantive

rights, but a method for vindicating federal rights elsewhere conferred by those parts of the

United States Constitution and federal statutes that it describes."  <u>Baker v. McCollan</u>, 443 U.S.

137, 144 n.3 (1979).

To sustain his § 1983 claims against the individual defendants, plaintiff must allege that

they were (1) "acting under color of state law" and (2) "deprived ... [him] of rights, privileges, or

immunities secured by the Constitution or laws of the United States."  <u>Pitchell v. Callan</u>, 13 F.3d

545, 547 (2d Cir. 1994).  Moreover, he must allege the direct or personal involvement of each of

the individual defendants in the alleged constitutional deprivations.  <u>Farrell v. Burke</u>, 449 F.3d

470, 484 (2d Cir. 2006).

Under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), a municipal entity

may be held liable under § 1983 where a plaintiff demonstrates that the constitutional violation

complained of was caused by a municipal "policy or custom."  <u>Monell</u>, 436 U.S. at 694-95;

<u>Patterson v. County of Oneida</u>, 375 F.3d 206, 226 (2d Cir. 2004).  "The policy or custom need

not be memorialized in a specific rule or regulation."  <u>Kern v. City of Rochester</u>, 93 F.3d 38, 44

(2d Cir. 1996) (citing <u>Sorlucco v. N.Y. City Police Dep't</u>, 971 F.2d 864, 870 (2d Cir. 1992)).

However, a municipal entity may be held liable only where the entity itself commits a wrong; "a

municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  <u>Monell</u>, 436

U.S. at 691.

A.    *Monell* **(Count IV)**

Plaintiff raises a Monell claim against the City and NYCHH for "unlawful seizure, excessive force, and deliberate indifference to his medical needs of glaucoma and further violations of due process rights protected and guaranteed by the United States Constitution." Notwithstanding these vague allegations, plaintiff's focus appears to be on the EDP Policy.

As explained above, plaintiff does not have standing to challenge the EDP Policy because he offers no evidence that he was subjected to a mental health arrest or to any other action authorized under the EDP Policy.  To sustain his Monell claim against the City and NYCHH, plaintiff would have to show the existence of some other policy which did, in fact, cause the harms alleged.  Because plaintiff has not pointed to any other policy, the Monell claim fails.

B.    **Procedural Due Process (Count V)**

Plaintiff claims that defendants violated the New York State Hospital Patients' Bill of Rights, codified at 10 N.Y.C.R.R. § 405.7 (the "NYS Patients' Bill of Rights") by not assigning him a psychiatrist or psychologist or providing him with a psychiatric evaluation before administering antipsychotic drugs to him against his will, and thereby deprived him of his Fifth and Fourteenth Amendment procedural due process rights.  However, the Fifth Amendment "governs the conduct of the *federal* government and *federal* employees, and does not regulate the activities of state officials or state actors."  Cassidy v. Scoppetta, 365 F.Supp.2d 283, 286 (E.D.N.Y. 2005) (citation omitted) (emphases in original).  Thus, the Court evaluates plaintiff's procedural due process claim solely under the Fourteenth Amendment.  See Dusenbery v. United States, 534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the States, from depriving any person of property without 'due process of law.'").

18

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Bangs v. Smith, 84 F.4th 87, 97 (2d Cir. 2023) (quoting Wilkinson v. Austin, 545 U.S. 209, 221 (2005). The NYS Patients' Bill of Rights does not give rise to a private right of action. Newman v. Katz, No. 24-cv-6681, 2025 WL 2171803, at *4 (S.D.N.Y. July 29, 2025) (collecting cases). Accordingly, "it does not appear that New York law created, in the [NYS] Patients' Bill of Rights, a liberty interest for a hospital patient, such as [p]laintiff." Id. Accordingly, Count V is dismissed.

### C.    Conditions of Confinement and Deliberate Indifference to Medical Needs (Count VIII)

Plaintiff alleges that defendants injected him with antipsychotics while ignoring his serious medical needs, which "caused plaintiffs [sic] needless pain and created a risk of permanent physical injury or even death" and violated his Eighth Amendment rights. It is well settled that the Eighth Amendment "has no application" when there has been "no formal adjudication of guilt." City of Revere v. Massachusetts General Hosp., 463 U.S. 239, 244 (1983). Plaintiff was never arrested or charged with a crime, let alone convicted of one. Therefore, Count VIII is dismissed.

### D.    Failure to Protect (Count IX)

Plaintiff argues that defendants failed to protect him from the ultimate harm to his right eye, "as they were the ones who knowingly denied [him] the required medication." Plaintiff does not point to the deprivation of any Constitutional or federal right, which dooms his claim. See Pitchell, 13 F.3d at 547.

In plaintiff's opposition to the City and NYCHH's motions, plaintiff indicates that his failure to protect claim is premised on a due process violation, presumably under the Fourteenth

Amendment.  He then argues that his case falls under the "'state-created danger' exception to the general rule that a state does not violate a person's substantive due process rights by failing to protect that person from private violence," which applies "when a state actor's conduct creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger that they otherwise would have been."

Plaintiff gets the rule mostly right.  See Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 427-28 (2d Cir. 2009) ("Although as a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause, state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence." (cleaned up)).  But the "state-created danger" exception does not apply to these facts.  Plaintiff has not alleged, let alone showed, the existence of "private violence."  None of the defendants in this action are private actors, nor have any of them committed violence against plaintiff.  Thus, Count IX fails.

## V.  **Conspiracy: Count X**

"To state a claim under § 1985(3), a plaintiff must allege: '(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States.'"  Posr v. Pascale, No. 15-cv-0584, 2017 WL 1366004, at *6 (E.D.N.Y. April 12, 2017) (quoting Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999)).  The conspiracy must also be "motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action.'"  Id. (quoting Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1088 (2d Cir. 1993)).  Finally, "a plaintiff must provide some

factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." Id. (quoting Webb v. Goord, 340 F.3d 105, 110-111 (2d Cir. 2003)).

Plaintiff's conspiracy claim makes little sense: his references to defendants' scheme to prepare and distribute "poisoned food" to multiple plaintiffs strongly suggest that he indiscriminately copied and pasted from another's complaint or brief, yet again, or that his allegations are delusional. Although plaintiff provides some further (and more appropriate) detail in his opposing memoranda, his conspiracy claim amounts to nothing more than an acknowledgement that multiple individuals and entities caused harm to plaintiff. Clearly this is insufficient to establish a "meeting of the minds," otherwise every multi-defendant case would be a conspiracy case.

"Even where a plaintiff is proceeding *pro se*, [a] constitutional conspiracy claim must be pled with at least some degree of particularity." Morpurgo v. Inc. Vill. of Sag Harbor, 697 F. Supp. 2d 309, 340 (E.D.N.Y. 2010) (internal quotation marks omitted). Plaintiff has provided only conclusory, vague, and general allegations of conspiracy and has not even hinted at a link between this "conspiracy" and his race. See Gyadu v. Hartford Ins. Co., 197 F.3d 590, 591 (2d Cir. 1999). Count X therefore fails.

## VI.     Racial Discrimination: Counts XI and XII

Plaintiff's eleventh and twelfth causes of action, racial discrimination under 42 U.S.C. § 2000a and 42 U.S.C. § 1981, also make little sense. It again appears that plaintiff has copied and pasted irrelevant material from another's brief. For example, nowhere in the complaint does plaintiff allege facts showing that defendants "target[ed] interracial companions in the use of their establishment."

21

In any event, the Court sees no facts anywhere in the complaint that it could cobble together to support an inference that any of the defendants discriminated against plaintiff on the basis of his race.  Counts XI and XII thus fail.

## CONCLUSION

For the foregoing reasons, the Court grants defendants' motions for summary judgment. This case is dismissed.

**SO ORDERED.**

*Brian M. Cogan*

_____
U.S.D.J.

Dated: Brooklyn, New York
      December 15, 2025

22